# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

NORTHEAST OKLAHOMA ELECTRIC )
COOPERATIVE, an Oklahoma Cooperative )
Corporation, )
 )
        **Plaintiff,** )
 )
v. )
 ) Case No. 11-CV-0320-CVE-FHM
SOUTHWESTERN BELL TELEPHONE )
COMPANY, d/b/a AT&T OKLAHOMA, )
 )
 )
        **Defendant.** )

## OPINION AND ORDER

Now before the Court are Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. # 42) and Motion for Partial Summary Judgment of Defendant Southwestern Bell Telephone Company, d/b/a AT&T Oklahoma and Brief in Support (Dkt. # 45).

**I.**

The material facts are not in dispute; however, the parties disagree as to the legal effect of those undisputed facts. See Dkt. # 51 at 8; Dkt. # 52 at 12.

Plaintiff Northeast Oklahoma Electric Cooperative (NEOEC) is an electric cooperative association organized pursuant to Oklahoma's Electric Cooperative Act. Plaintiff owns and operates an electrical distribution system, which consists, in part, of utility poles, throughout various counties in Oklahoma. On October 7, 1982, NEOEC entered into an Agreement for Joint Use of Electric System Poles (the original contract) with defendant Southwestern Bell Telephone Company, d/b/a AT&T Oklahoma, (AT&T). Under the original contract, AT&T was entitled to place its equipment on the utility poles owned by plaintiff in exchange for a payment by defendant to plaintiff of $5.00

per jointly used pole per year. The original contract stated that it "shall remain in effect until terminated at the end of 25 years from the date hereof or thereafter upon the giving of written notice to the other party not less than three years prior to the date of termination." Dkt. # 45-1at 5. In 2002, the parties executed an amendment to the original contract, which entitled plaintiff to payment of $9.00 per pole per year for each pole used by defendant. Dkt. # 45-1 at 8.

On March 25, 2004, plaintiff sent a letter to defendant stating that the original contract was due to expire in 2007 and that "it is necessary to give [AT&T] a three year notice in order for [AT&T] to have adequate time to complete attachment removal, if a new contract is not successfully negotiated. Please consider this letter to be that notice." Dkt. # 45-6 at 1. Thus, due to the fact that it gave more than three years notice to defendant, plaintiff alleges that the original contract expired on October 7, 2007. Dkt. # 16 at 2. The parties then entered into negotiations for a new contract; however, those negotiations proved unsuccessful. In the interim, defendant's equipment has remained on plaintiff's utility poles.

On April 29, 2009, plaintiff sent an invoice to defendant charging $15.51 per pole for defendant's use of the poles in 2008. Dkt. # 45-3 at 1. Defendant remitted that amount to plaintiff. Dkt. # 45-3 at 2.

On May 1, 2009, plaintiff sent a letter to defendant stating that, in light of the fact that the original contract expired on October 7, 2007, plaintiff wished to enter a new contract with defendant for the years 2009 through 2011. Dkt. # 45-11. Plaintiff enclosed a copy of a proposed contract, which, rather than offer a rate per utility pole used by defendant, offered a rate of $20.00 per individual attachment per year. Thus, if defendant had more than one attachment on a single utility pole, plaintiff wanted defendant to pay separately for each of those attachments rather than paying

2

per each pole used, as was done previously. The letter gave defendant sixty days to accept the offer and stated that, if defendant had not signed the proposed contract in that time, plaintiff would assume the offer was rejected and defendant "will need to have all attachments to [NEOEC's] poles removed within 180 days of the above mentioned 60 day period." Id. at 1.

On May 19, 2009, defendant sent a letter to plaintiff suggesting changes to the proposed contract. Dkt. # 45-12. Defendant stated that it was willing to pay $15.51 per pole, but that "$20/pole [sic] as proposed on the contract is entirely out of line with rates that we pay elsewhere in the state . . . ." Id. at 1. Defendant sent another letter to plaintiff on May 27, 2009, attaching further proposed changes to the contract. Dkt. # 45-19. Defendant reiterated that it "remains willing to pay the 2008 invoice at $15.51/pole provided that we are able to sign an agreement. $20/pole [sic] as proposed on the contract is entirely out of line with rates that we pay elsewhere in the state . . . ." Id. at 1.

On October 29, 2009, with no new contract having been agreed to by the parties, plaintiff's attorney sent a letter to defendant, stating that plaintiff "remains willing to enter into an Attachment License Agreement on the same terms as that Agreement enclosed with NEOEC's letter of May 1, 2009." Dkt. # 45-13 at 1. The letter further stated that, if defendant failed "to execute this Attachment License Agreement, then AT&T must remove its attachments from NEOEC's utility poles. In accordance with NEOEC's previous demand, all attachments must be removed on or before January 1, 2010." Id. at 2. The letter stated that, if AT&T did not remove its attachments by that date,

> NEOEC will consider AT&T's refusal to comply with NEOEC's demand that it remove its attachments by January 1, 2010, as constituting an implied acceptance of the benefit offered in the Attachment License Agreement sent to your attention on May 1, 2009. Accordingly, AT&T's continued attachment to NEOEC's pole[s] will

3

constitute an acceptance by AT&T of the obligation specified in that Agreement to pay the annual rate of $20.00 per attachment per pole . . . .

Id.

On December 17, 2009, plaintiff's attorney sent another letter to defendant, stating that he had reviewed defendant's proposed changes to the proposed contract, but some of those proposed changes were not acceptable to plaintiff. Dkt. # 45-9. Plaintiff's attorney enclosed a revised proposed contract, which incorporated certain acceptable changes proposed by defendant. The letter stated that plaintiff "can only reiterate NEOEC's demand that this office receive a fully executed Attachment License Agreement from AT&T on or before January 1, 2010 in order to forestall those adverse consequences which I have earlier described in my letter of October 29, 2009." Id. at 1.

On January 5, 2010, defendant sent a letter to plaintiff's attorney stating that the terms of the most recent proposed contract were "unacceptable" to defendant. Dkt. # 52-2 at 1. The letter further stated that defendant did not "agree with [NEOEC's] position that our refusal to remove our attachments constitutes our implied acceptance of the terms of the proposed Attachment License Agreement." Id. Defendant stated that it "recognize[s] our obligation to continue to pay reasonable annual rental fees for the attachments . . . ." Id.

On July 30, 2010, plaintiff sent an invoice to defendant for 2009, charging $15.51 per attachment. Defendant remitted payment reflecting a charge of $15.51 per pole. Plaintiff accepted the payment.

On September 7, 2010, plaintiff again sent a letter to defendant attaching a "most recent and final version" of a proposed contract. Dkt. # 45-10 at 1. The letter stated that, if defendant did not execute the proposed contract by October 15, 2010, "any pending or perceived attachment agreement offer will cease." Id. This proposed contract offered a rate of $20 per attachment for

4

2010, subject to a ten percent annual increase. Defendant responded by letter on September 20, 2010, stating that defendant "does not and never has agreed to pay rent on multiple attachments per pole." Dkt. # 45-15 at 1. Defendant stated that it remained willing to pay $15.51 per pole.

On January 21, 2011, plaintiff sent an invoice for 2010 to defendant, charging $20 per attachment. Defendant submitted payment for 2010 reflecting a payment of $15.51 per pole. In a March 16, 2011 letter to defendant, plaintiff stated that the attempted payment was inadequate and returned defendant's check. Dkt. # 45-18. The parties' continued inability to agree on a rate for 2010 and 2011 has led to this lawsuit.

Plaintiff sued defendant in Oklahoma state court on May 3, 2011, alleging breach of contract and nuisance and/or nuisance per se. Dkt. # 2-1. The petition sought damages for breach of contract, an order of ejectment, a permanent injunction enjoining defendant's use of the utility poles, damages based on the nuisance claim, and attorney's fees and costs. Id. Defendant removed the action on May 24, 2011, based on diversity of citizenship. Dkt. # 2. Plaintiff filed an amended complaint on June 9, 2011, alleging breach of contract and nuisance and/or nuisance per se. In the amended complaint, plaintiff alleges that, pursuant to its letters of October 29, 2009 and December 17, 2009, defendant's failure to remove its equipment from plaintiff's utility poles constituted an implied acceptance of plaintiff's offer for a rate of $20 per attachment. The amended complaint further alleges that, by keeping its equipment on the utility poles without plaintiff's consent, defendant has committed and is committing a nuisance and/or a nuisance per se. Plaintiff moves for summary judgment on all of its claims; defendant moves for partial summary judgment on the contract claim on the ground that the 1982 contract is still in effect and that plaintiff is legally

5

obligated to charge a rate based on plaintiff's costs, and partial summary judgment on the nuisance claim insofar as plaintiff seeks injunctive relief.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(a) mandates the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir.1998).

Summary judgment is appropriate where there is no genuine dispute as to any material fact, but the "legal conclusions that may be draw from those facts" are disputed by the parties. Goichman v. City of Aspen, 859 F.2d 1466, 1467-68 (10th Cir. 1988). In diversity cases governed by state law, this Court must ascertain and apply the state law so as to reach the same result that the state court would reach. See Pub. Serv. Co. of Okla. v. Burlington N. R.R. Co. 53 F.3d 1090, 1096 (10th Cir. 1995).

### III.

**A. Contract Claim**

Plaintiff moves for summary judgment on its contract claim, arguing that defendant's failure to remove its equipment from plaintiff's utility poles constitutes an implied acceptance of the proposed contract. Thus, plaintiff argues that an implied contract exists containing the terms of plaintiff's proposed contract. Defendant opposes plaintiff's motion and, in its opposition, argues that summary judgment should be granted to defendant. Defendant contends that the original contract, signed in 1982, is still in effect. See Dkt. # 52 at 17, n.3. Defendant urges this Court to find, as a matter of law, that no new contract was entered by the parties and that defendant should be obligated to pay only a rate "based on prevailing industry standards of a 'just and reasonable' rate based on cost." Dkt. # 52 at 18.

As an initial matter, the Court finds that plaintiff's termination of the original contract was valid, and the original contract is not in effect. The original contract stated that it "shall remain in effect until terminated at the end of 25 years from the date hereof or thereafter upon the giving of

written notice to the other party not less than three years prior to the date of termination." Dkt. #45-1 at 5. The original contract was dated October 7, 1982, and could be terminated twenty-five years later (October 7, 2007) or thereafter, upon written notice at least three years in advance of termination. On March 25, 2004, more than three years prior to October 7, 2007, plaintiff sent a letter to defendant stating that the contract was due to expire and "it is necessary to give [AT&T] a three year notice in order for [AT&T] to have adequate time to complete attachment removal, if a new contract is not successfully negotiated. Please consider this letter to be that notice." Dkt. # 45-6 at 1.

Defendant argues that this letter did not provide effective notice to defendant that plaintiff was terminating the original contract because the letter contemplates that a new contract could be negotiated and because defendant's equipment remained on plaintiff's utility poles after 2007. Dkt. # 45 at 25-27. Defendant's argument is unavailing. While the letter leaves open the possibility that the parties could negotiate a new contract, and defendant would therefore not have to remove its equipment, the letter unequivocally and unambiguously states that "this letter is to be that notice" of termination of the original contract. Plaintiff was entitled to terminate the existing contract while still negotiating a new contract, and it did precisely that. The plain language of plaintiff's letter does not make the termination conditional on the negotiation of the new contract, as defendant asserts. The Court finds that plaintiff's March 25, 2004 letter was effective notice of termination under the terms of the original contract, and the original contract was terminated on October 7, 2007. See OKLA. STAT. tit. 15, § 160 ("The words of a contract are to be understood in their ordinary and popular sense . . . ."); Whitehorse v. Johnson, 156 P.3d 41, 47 (Okla. 2007) ("The interpretation of a contract . . . is a matter of law for the Court to resolve.").

The Court must next determine whether an implied contract was created by the conduct of the parties. Under Oklahoma law, contracts may be either express or implied. See OKLA. STAT. tit. 15, § 131. In an express contract the terms are stated in words. See OKLA. STAT. tit. 15, § 132. In an implied contract, the existence and terms are manifested by conduct. See OKLA. STAT. tit. 15, § 133. An implied contract is a contract implied in fact. Ray F. Fischer Co. v. Loeffler–Green Supply Co., 289 P.2d 139 (Okla. 1955). In express and implied contracts an agreement exists between the parties. Wattie Wolfe Co. v. Superior Contractors, Inc., 417 P.2d 302, 308 (Okla. 1966). On the other hand, a quasi-contract does not arise from the parties' agreement or conduct but is an obligation implied in law. See First National Bank of Okmulgee v. Matlock, 226 P. 328, 331 (Okla. 1924). As the Oklahoma Supreme Court explained in Jones v. Univ. of Cent. Okla., 910 P.2d 987, 989, n.1 (Okla. 1995):

> an implied contract involves an implication of fact in contrast with a quasi or constructive contract involving an implication of law. In the constructive contract, the agreement is a mere fiction, imposed to adapt the case to a given remedy. The implied contract involves a fact legitimately inferred. In the constructive contract intention is disregarded, but intention is ascertained and enforced in an implied contract. For a constructive contract the duty defines the contract. For an implied contract the contract defines the duty.

(citing Conkling's Estate v. Champlin, 141 P.2d 569, 570 (Okla. 1943)); see also Booker v. Sears Roebuck & Co., 785 P.2d 297, 302, n.3 (Okla. 1989) (Summers, J., concurring) ("implied contracts are true contracts, which quasi-contracts are not . . . . Instead, liability [in a quasi-contract] is based on a duty which is imposed by law.") (internal quotations omitted). Plaintiff argues that defendant's actions allow the court to infer that an implied contract was entered into between the parties containing the terms of plaintiff's proposal. Defendant argues that its actions do not manifest an

9

intention to enter such a contract, and that only a quasi-contract can be can be imposed under which it must pay a reasonable rate for use of the utility poles.

When determining whether an implied contract exists, the Court will consider:

(a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements, (c) the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract.

Dixon v. Bhuiyan, 10 P.3d 888, 891 (Okla. 2000). While making its assessment, the Court must be mindful of the legal principle that the "law will not make a better contract than the parties themselves have seen fit to enter into, or alter it for the benefit of one party to the detriment of another." King-Stevenson Gas & Oil Co. v. Texam Oil Corp., 466 P.2d 950, 954 (Okla. 1970). Finally, the Court is "also cognizant of the rule that an implied contract encompasses all provisions - discernible from the circumstances under which the agreement was reached - which are indispensable to effectuate the parties' intentions." Dixon, 10 P.3d at 891.

Plaintiff argues that, because defendant left its equipment on the utility poles after January 1, 2010, defendant impliedly accepted plaintiff's proposal for a new contract charging $20 per attachment. Because plaintiff made numerous offers to defendant throughout 2009 and 2010, each offer must be analyzed individually to determine whether it was impliedly accepted by defendant.

In its May 1, 2009 letter, plaintiff offered defendant a rate of $20 per attachment and stated that the offer would remain open until July 1, 2009. Dkt. # 45-11. Plaintiff further stated that, if defendant did not execute the proposed contract, it would be required to remove its attachments by January 1, 2010. Id. Defendant responded to this letter on May 19 and May 27, 2009, stating that it would not enter the contract as proposed by plaintiff, but proposing terms agreeable to defendant. Dkt. ## 45-12, 45-19. Defendant's letters served as rejections and counter-offers to plaintiff's

10

proposed contract, which terminated defendant's ability to accept plaintiff's May 1, 2009 offer. See Restatement (Second) of Contracts § 39 ("An offeree's power of acceptance is terminated by his making of a counter-offer . . . ."); In re De-Annexation of Certain Real Property from City of Seminole, 204 P.3d 87, 91 (Okla. 2009). In addition, by its own terms, plaintiff's offer expired on July 1, 2009, and could not be accepted thereafter. OKLA. STAT. tit. 15, § 73(2) ("A proposal is revoked . . . [b]y the lapse of the time prescribed in such proposal for its acceptance . . . ."). Thus, the offer made in plaintiff's May 1, 2009 letter was terminated by defendant's counter-offer and would nevertheless have been revoked on July 1, 2009. The fact that defendant's equipment remained on the utility poles after this time could not have been an implied acceptance of an offer, as there was no offer pending.

Plaintiff again wrote to defendant on October 29, 2009, offering to charge a rate of $20 per attachment. Dkt. # 45-13. This letter stated that, if defendant failed to accept this offer, it must remove its attachments by January 1, 2010. Plaintiff stated that, if defendant did not remove its attachments by January 1, 2010, plaintiff would consider the presence of the attachments to be "an implied acceptance" of the offer. Id. at 2. Defendant again rejected this offer and made a counter-offer. See Dkt. 45-9 (letter from plaintiff's counsel stating that he has received defendant's "redline copy of the changes to the Attachment License Agreement that you had emailed me"). Thus, the October 29 offer was terminated by defendant's rejection and counter-offer and could not have been impliedly accepted.

Plaintiff's December 17, 2009 letter again offers defendant a contract on the same terms as that offered in the October 29 letter. Dkt. # 45-19. The December 17 letter reiterates that, if the contract is not executed by January 1, 2010, "the adverse consequences" described in the October

11

29 letter will take effect. One of those adverse consequences is that plaintiff will deem the presence of defendant's equipment on plaintiff's utility poles after January 1, 2010, to be an implied acceptance of the offer. Defendant did not remove its equipment from plaintiff's utility poles by January 1, 2010. However, on January 5, 2010, defendant sent a letter to plaintiff's attorney stating that the provisions of the proposed agreement were "unacceptable" to defendant. Dkt. # 52-2. The letter further stated that defendant did not "agree with [plaintiff's] position that our refusal to remove our attachments constitutes our implied acceptance of the terms of the proposed Attachment License Agreement." Id.

Plaintiff argues that, based on the terms of the December 17 offer and despite defendant's January 5 letter, defendant's failure to remove its equipment constituted an implied acceptance of plaintiff's offer to charge $20 per attachment. Plaintiff relies on Wattie Wolfe Co. v. Superior Contractors, Inc., 417 P.2d 302 (Okla. 1966), in which the Supreme Court of Oklahoma held that a contract was implied between the parties where the plaintiff performed work, believing a contract was in place, and the defendant received the benefit of that work. The court stated that the "conduct of the party accepting the benefits of a transaction, with knowledge, either actual or constructive, of all of the pertinent facts, coupled with the conduct of the other party, the benefits of which were so accepted, manifests the existence of a contract covering the transaction - an implied contract." Id. at 308 (citing OKLA. STAT. tit. 15, § 75).[1] Plaintiff argues that, by leaving its equipment on the utility poles with knowledge that plaintiff would construe that as an acceptance to the contract, defendant impliedly accepted the contract. However, Wattie Wolfe Co. did not involve a situation

---

[1] OKLA. STAT. tit. 15, § 75 states: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known to the person accepting."

12

where the party receiving the benefit of the alleged contract expressly stated an intent not to enter into the contract. Oklahoma law is clear that a contract will not be implied where one party has expressly rejected the contract, even where that party received a benefit. See Wagner v. Blakenship, 250 P.2d 471, 473-74 (Okla. 1952) (holding that "a contract will not be inferred where to do so would . . . [be] against the express declaration of the person to be charged" even where that person has profited by the transaction); see also Jones, 910 P.2d at 989-90 (citing Wagner).

In this case, defendant repeatedly stated that it would not enter a contract containing the terms proposed by plaintiff. See Dkt. ## 45-12 ("$20/pole [sic] as proposed on the contract is entirely out of line with rates that we pay elsewhere in the state"); 45-19 (same); 52-2 ("I have reviewed the latest draft of the proposed Attachment License Agreement . . . and unfortunately there continue to be a number of provisions that are unacceptable to us."). Because defendant repeatedly expressed its refusal to enter into a contract on plaintiff's terms, this Court cannot find that an implied contract exists. See Wagner, 250 P.2d at 473-74. This is true despite the fact that defendant continued to receive the benefit of having its equipment on plaintiff's utility poles. Id.

Plaintiff made one final attempt to enter into a contract with defendant. On September 7, 2010, plaintiff sent a letter to defendant enclosing another version of the proposed contract. The letter stated that, if the proposed contract was not executed by October 15, 2010, "any pending or perceived attachment agreement offer will cease." Dkt. # 45-10 at 1. Defendant responded by letter, dated September 20, 2010, and rejected plaintiff's offer, stating that it was willing to pay only $15.51 per pole. Dkt. # 45-15. Defendant's rejection of plaintiff's offer terminated the offer, and there was no outstanding offer for defendant to impliedly accept.

Having considered the Dixon factors, and for the reasons stated above, the Court finds that there is no implied contract between the parties. This is a situation where defendant has received a benefit from plaintiff, namely use of plaintiff's utility poles, without a contract. Thus, any recovery by plaintiff must be based on a quasi-contract theory.

"The measure of damages in a quasi-contract action is the amount which will compensate the party aggrieved for the detriment proximately caused thereby, and, if the obligation is to pay money, the detriment caused by the breach in the amount due by the terms of the obligation." Welling v. Am. Roofing & Sheet Metal Co., 617 P.2d 206, 209-10 (Okla. 1980). "Where personal property is so taken and used for a time, the benefits received by the wrongdoer are ordinarily to be measured by the amount he would have been obliged to pay for like benefits under the prevailing conditions." Monarch Refineries v. Union Tank Car Co., 141 P.2d 556, 558 (Okla. 1943). Defendant's obligation is for the payment of money, and the defendant has been using plaintiff's property to its advantage. Thus, the detriment to plaintiff is measured by the obligation to pay the amount defendant would have been obliged to pay "for like benefits under the prevailing conditions." Id. The determination of such a rate is a question of fact not appropriate for resolution by summary judgment. See Piggee v. Mercy Hosp., 186 P.2d 817, 819 (Okla. 1947) (holding that the measure of damages in quasi-contract case should have been submitted to jury); see also Fischer Imaging Corp. v. Gen. Elec. Co., 187 F.3d 1165, 1172 (10th Cir. 1999) ("Generally, in quasi-contract actions courts have submitted the question of the value of the goods or services to the jury.").

Defendant concedes that it must pay a "reasonable rate" to plaintiff for use of plaintiff's utility poles. Dkt. # 52 at 17-18. In its motion for summary judgment, defendant asks this court to

14

find, as a matter of law, that such rate "must comply with a standard for cost-based rates, based on evidence of Plaintiff's costs and the allocation of such costs to all entities (including Plaintiff itself) attaching facilities to Plaintiff's poles." Dkt. # 45 at 7, n.1. In support of its contention that such a "cost-based standard" should be imposed, defendant first relies on authority stating that the telephone service provided by defendant "is a regulated service affected with a public interest." Dkt. # 45 at 14-15 (citing, e.g., OKLA STAT. tit. 17, §§ 131, 139.106). Thus, defendant argues, if plaintiff can charge an "arbitrary" rate for use of the utility poles, it will have an adverse impact on the public interest that defendant is obligated to serve. While it is evident that defendant has a legal duty to serve the public, defendant has not cited any legal authority that plaintiff has a legal duty to support defendant's service to the public. The rate charged by plaintiff for use of its utility poles may affect defendant's ability to serve the public; however, that duty is defendant's duty and is not assumed by plaintiff merely because plaintiff provides a service to defendant. Had the Oklahoma legislature desired to impose such a duty on plaintiff, it could have done so.

Defendant next argues that the Court should require plaintiff to employ the cost-based standard imposed on utility facilities by the Pole Attachments Act (PAA), codified at 47 U.S.C. § 224. The PAA states that a "utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it." Id. § 224(f). The PAA further provides that the Federal Communications Commission (FCC) has authority to "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable . . . ." Id. §224(b). The FCC has, in turn, promulgated regulations prescribing that pole attachment rates should be calculated, in part, based on costs. 47 C.F.R. § 1.1401, et seq. However, the PAA

15

explicitly states that it does not apply to "any person who is cooperatively organized." 47 U.S.C. § 224(a). It is undisputed that plaintiff is a cooperatively organized association, and defendant acknowledges that the PAA, and as a result, the FCC regulations regarding pole attachments, do not apply to plaintiff. See Dkt. # 45 at 17. Nevertheless, defendant urges this Court to find that the cost-based rate should be imposed because "the statute is persuasive as underlying federal policy favoring cost-based rates for use of utility facilities . . . ." Id. Congress certainly had the authority to require cooperatives, such as plaintiff, to adhere to the PAA and the FCC regulations promulgated thereunder. However, Congress explicitly and unambiguously chose to exempt organizations such as plaintiff from those requirements. This Court will not impose a requirement on plaintiff from which Congress specifically exempted it. While the FCC regulations, as well as the other sources cited by defendant, may be relevant to the fact-finder's determination of what defendant would have been obliged to pay for like benefits under the prevailing conditions, defendant has failed to cite any legal authority that a cost-based rate is mandatory in the present case.

### B. Injunctive Relief Based on Nuisance

Plaintiff contends that defendant's "continued occupation" of the utility poles, despite plaintiff's requests for removal, constitutes a nuisance and/or a nuisance per se, and seeks damages and permanent injunctive relief enjoining the nuisance. Defendant seeks summary judgment on the injunctive relief aspect of the nuisance claim. Under Oklahoma law, a nuisance "consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either . . . [a]nnoys, injures or endangers the comfort, repose, health, or safety of others; or . . . [i]n any way renders other persons insecure in life, or in the use of property . . . ." OKLA. STAT. tit. 50, § 1. "In order to maintain a cause of action for nuisance, the plaintiff must prove an unlawful act or omission of duty

which either injured or endangered his use of his property." N.C. Corff P'ship, Ltd. v. OXY USA, Inc., 929 P.2d 288, 294 (Okla. Civ. App. 1996) (citing Thompson v. Andover Oil Co., 691 P.2d 77, 83 (Okla. Civ. App.1984)).

The undisputed facts demonstrate that defendant has maintained approximately 10,000 attachments on plaintiff's utility poles since 1982. Defendant has not installed any new attachments to plaintiff's poles since at least May 2009. See Dkt. # 52 at 9; Dkt. # 59 at 5. Plaintiff does not argue that these attachments were unlawful or imposed any obstruction or hazard until after January 1, 2010, when defendant refused to pay plaintiff's proposed fee.

This Court has found that, based on the undisputed facts, a contract implied in law exists between the parties. Therefore, the holdover of defendant's equipment on plaintiff's utility poles cannot be considered "unlawful." Plaintiff cannot meet the elements of a nuisance claim under Oklahoma law[2] and, therefore, summary judgment on the claim for injunctive relief based on nuisance is appropriate.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. # 42) is **denied**.

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment of Defendant Southwestern Bell Telephone Company, d/b/a AT&T Oklahoma and Brief in Support (Dkt. # 45) is **granted** as to the claim for injunctive relief based on nuisance, and **denied** in all other respects.

---

[2] This finding signals that plaintiff cannot argue at trial that defendant's conduct in keeping the attachments on the utility poles was unlawful and, thus, that plaintiff's claim for damages based on nuisance will not survive a Rule 50 motion at trial. However, defendant did not specifically move for summary judgment on the damages aspect of the nuisance claim and the time to do so has passed.

**IT IS FURTHER ORDERED** that jury trial remains set for **February 21, 2012** at 9:15 a.m. on the issue of a reasonable rate payable by defendant, measured by the amount defendant would have been and is obliged to pay for the benefits under prevailing conditions for the year 2010 and continuing thereafter.

**DATED** this 23rd day of January, 2012.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT